## EXHIBIT 1

### Certificate of Corporate Resolutions

A copy of the executed Certificate of Corporate Resolutions is annexed hereto as "Exhibit 1."

## CERTIFICATE OF CORPORATE RESOLUTIONS
## OF
## UBS SECURITIES JAPAN CO., LTD.

At a duly held meeting on December 18, 2012, the Board of Directors (the "Board") of UBS Securities Japan Co., Ltd. (the "Company") resolved as follows:

**WHEREAS,** the Company, through its legal counsel, has been engaged in discussions with the United States Department of Justice, Criminal Division in connection with its investigation into potential criminal violations related to the London Interbank Offered Rate ("LIBOR") and other benchmark interest rates (the "LIBOR Investigation");

**WHEREAS,** the executive management of the Company, and its affiliates, and both internal and external legal counsel have reported to the Board the terms and conditions of a proposed resolution of the LIBOR Investigation;

**WHEREAS,** the Board has been advised by its legal counsel of the Information and a Plea Agreement, with appendices, as circulated to the Board on December 18, 2012 (collectively the "Plea Agreement"), including, but not limited to, the criminal fine payment; and

**WHEREAS,** the Board acknowledges that the Plea Agreement fully sets forth the Company's agreement with the United States Department of Justice, Criminal Division with respect to criminal violations identified during the LIBOR Investigation and that no additional promises or representations have been made to the Company by any officials of the United States in connection with the disposition of the LIBOR Investigation, other than those set forth in the Plea Agreement.

This Board hereby **RESOLVES** that:

1. The Board approves and agrees that it is in the best interest of the Company to enter the guilty plea provided for, and agrees to the other terms provided in the Plea Agreement with the United States Department of Justice in substantially the form and substance set forth in the form of Plea Agreement presented to this Board;

2. The directors of the Company and legal counsel for the Company are hereby each individually authorized, empowered and directed, on behalf of the Company, to execute and deliver the Plea Agreement, substantially in such form as reviewed by this Board, with such changes as such directors or legal counsel may approve;

3. The directors of the Company and legal counsel for the Company are hereby each individually authorized, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolution (including execution and delivery of any such agreement or document on behalf of the Company);

4. Abby S. Meiselman, Managing Director and Head of Americas Investment Banking Litigation for UBS AG, or her delegate, be and hereby is authorized (i) to execute the Plea Agreement on behalf of the Company, with such modifications as she may approve, (ii) to act and speak on behalf of the Company, in any proceeding or as otherwise necessary, for the purpose of executing the Plea Agreement, including entry of a guilty plea in court on behalf of the Company, and (iii) to take further action as appears to her

necessary or desirable to carry into effect the intent and purpose of the foregoing resolution; and

5. All of the actions of the directors of the Company and legal counsel for the Company, which actions would have been within the scope of and authorized by the foregoing resolution except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the Company; and

6. The representative directors of the Company are individually authorized, empowered or directed, to provide to the United States Department of Justice, Criminal Division a certified copy of this resolution.

I hereby certify that the above is a true and accurate copy of the resolutions of the Board of the Company passed on December 18, 2012.

December 18, 2012

Zenji Nakamura
Representative Director and CEO
UBS Securities Japan Co., Ltd.

2

## EXHIBIT 2
## Corporate Compliance Undertakings

Attached are the relevant excerpts of: (1) the agreements entered into by UBS Securities Japan's parent, UBS AG, in resolving regulatory investigations in this matter with the United States Commodity Futures Trading Commission; and (2) the business improvement order that the JFSA imposed on UBS Securities Japan based on the JFSA's investigation and findings relating to the attempted manipulation of submissions for Yen benchmark interest rates.  The Swiss Financial Market Supervisory Authority ("FINMA") will also be imposing compliance undertakings on UBS AG as part of the action that FINMA is taking based on its investigation of this matter.  UBS Securities Japan will provide a copy, translation, or summary of those undertakings when such information is available.  That document will then be attached to and incorporated in this exhibit.

If payment is to be made by electronic funds transfer, Respondents shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Respondents shall accompany payment of the CMP Obligation with a cover letter that identifies the paying Respondent and the name and docket number of this proceeding. The paying Respondent shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

C.     Respondents and their successors and assigns shall comply with the following conditions and undertakings set forth in the Offer:

    1.  PRINCIPLES[31]

        i.  UBS agrees to undertake the following: (1) to ensure the integrity and reliability of its Benchmark Interest Rate Submission(s), presently and in the future; and (2) to identify, construct and promote effective methodologies and processes of setting Benchmark Interest Rates, in coordination with efforts by Benchmark Publishers, in order to ensure the integrity and reliability of Benchmark Interest Rates in the future.

        ii.  UBS represents and undertakes that each Benchmark Interest Rate Submission by UBS shall be based upon a rigorous and honest assessment of information, and shall not be influenced by internal or external conflicts of interest, or other factors or information extraneous to any rules applicable to the setting of a Benchmark Interest Rate.

---

[31]   The following terms are defined as follows:

    **Benchmark Interest Rate**:  An interest rate for a currency and maturity/tenor that is calculated based on data received from market participants and published to the market on a regular, periodic basis, such as LIBOR and Euribor;

    **Benchmark Publisher**:  A banking association or other entity that is responsible for or oversees the calculation and publication of a Benchmark Interest Rate;

    **Submission(s)**:  The interest rate(s) submitted for each currency and maturity/tenor to a Benchmark Publisher.  For example, if UBS submits a rate for one month and three month U.S. Dollar LIBOR, that would constitute two Submissions;

    **Submitter(s)**:  The person(s) responsible for determining and/or transmitting the Submission(s); and

    **Supervisor(s)**:  The person(s) immediately and directly responsible for supervising any portion of the process of Submission(s) and/or any of the Submitter(s).

2. INTEGRITY AND RELIABILITY OF BENCHMARK INTEREST RATE SUBMISSIONS

    i. <u>DETERMINATION OF SUBMISSIONS</u>:  UBS shall determine its Submission(s) based on the following Factors, Adjustments and Considerations, unless otherwise prohibited by or contrary to an affirmative obligation imposed by any law or regulation, or the rules or definitions issued by a Benchmark Publisher.  UBS's transactions shall be given the greatest weight in determining its Submissions, subject to applying appropriate Adjustments and Considerations in order to reflect the market measured by the Benchmark Interest Rate.[32]

UBS shall determine its Submissions as described in these Undertakings within fourteen (14) days of the entry of this Order.

- <u>Factor 1 — UBS's Borrowing or Lending Transactions Observed by UBS's Submitters</u>:

   a. UBS's transactions in the market as defined by the Benchmark Publisher for the particular Benchmark Interest Rate;

   b. UBS's transactions in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper; and

   c. UBS's transactions in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, futures and Fed Funds.

- <u>Factor 2 — Third Party Transactions Observed by UBS's Submitters</u>:

   a. Transactions in the market as defined by the Benchmark Interest Rate relevant to each of the Submission(s);

   b. Transactions in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper; and

   c. Transactions in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, futures, and Fed Funds.

---

[32] The rules used by Benchmark Publishers to determine Benchmark Interest Rates vary, may not be consistent with each other, and provide different levels of guidance as to how to make Submissions.

- <u>Factor 3 — Third Party Offers Observed by UBS's Submitters</u>:

  a. Third party offers to UBS in the market as defined by the Benchmark Publisher relevant to each of the Submission(s);

  b. Third party offers in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper, provided to UBS by interdealer brokers (*e.g.,* brokers); and

  c. Third party offers provided to UBS in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, and Fed Funds.

- <u>Adjustments and Considerations</u>:  All of the following Adjustments and Considerations may be applied with respect to each of the Factors above:

  a. <u>Time</u>:  With respect to the Factors considered above, proximity in time to the Submission(s) increases the relevance of that Factor;

  b. <u>Market Events</u>:  UBS may adjust its Submission(s) based upon market events, including price variations in related markets, that occur prior to the time at which the Submission(s) must be made to the Benchmark Publisher. That adjustment shall reflect measurable effects on transacted rates, offers or bids;

  c. <u>Term Structure</u>:  As UBS applies the above Factors, if UBS has data for any maturity/tenor described by a Factor, then UBS may interpolate or extrapolate the remaining maturities/tenors from the available data;

  d. <u>Credit Standards</u>:  As UBS applies the above Factors, adjustments may be made to reflect UBS's credit standing and/or the credit spread between the market as defined by the Benchmark Publisher and transactions or offers in the related markets used in the Factors above.  Additionally, UBS may take into account counterparties' credit standings, access to funds, and borrowing or lending requirements, and third party offers considered in connection with the above Factors; and

62

e.  <u>Non-representative Transactions</u>:  To the extent a
transaction included among the Factors above significantly
diverges in an objective manner from other transactions,
and that divergence is not due to market events as
addressed above, UBS may exclude such transactions from
its determination of its Submission(s).

ii.  <u>SUPERVISOR(S) REVIEW</u>:  Effective within fourteen (14) days of the
entry of this Order, each daily Submission shall be reviewed by a
Supervisor on a daily basis after the Submission(s) are made to the
Benchmark Publisher.

iii.  <u>QUALIFICATIONS OF SUBMITTER(S) AND SUPERVISOR(S)</u>:  All
Submitter(s) shall have significant experience in the markets for the
Benchmark Interest Rate to which they are submitting or a comparable
market, but may designate less experienced parties, who routinely work
under their supervision, to make Submission(s) during limited periods of
absence.  All Supervisors shall have significant experience in the markets
for the relevant Benchmark Interest Rate or a comparable market.
Submitters, Supervisors and any parties designated to make Submission(s)
when the Submitter(s) are absent shall not be assigned to any derivatives
trading desk, unit or division within UBS, or participate in derivatives
trading other than that associated with UBS's liquidity and liability
management.  The compensation of Submitter(s) and Supervisor(s) also
shall not be directly based upon derivatives trading, other than that
associated with UBS's liquidity and liability management.

iv.  <u>FIREWALLS: INTERNAL CONTROLS REGARDING IMPROPER
COMMUNICATIONS AND SUBMISSIONS</u>:  UBS shall implement
internal controls and procedures to prevent improper communications with
Submitter(s) and Supervisor(s) regarding Submission(s) or prospective
Submission(s) to ensure the integrity and reliability of its Submission(s).
Such internal controls and procedures shall include, but not be limited to:

▪  The "firewalls" contemplated herein will be implemented through
written policies and procedures that delineate proper and improper
communications with Submitter(s) and Supervisor(s), whether
internal or external to UBS.  For these purposes, improper
communications shall be any attempt to influence UBS's
Submission(s) for the benefit of any derivatives trading position
(whether of UBS or any third party) or any attempt to cause UBS's
Submitter(s) to violate any applicable Benchmark Publisher's rules
or definitions, or Section 2 of these Undertakings; and

▪  A requirement that the Submitter(s) shall not be located in close
proximity to traders who primarily deal in derivatives products that

63

reference a Benchmark Interest Rate to which UBS contributes any Submission(s).  The two groups should be separated such that neither can hear the other.

v. <u>DOCUMENTATION</u>:  UBS shall provide the documents set forth below promptly and directly to the Commission upon request, without subpoena or other process, regardless of whether the records are held outside of the United States, to the extent permitted by law.

- For each Submission, UBS shall contemporaneously memorialize, and retain in an easily accessible format for a period of five (5) years after the date of each Submission, the following information:

  a. The Factors, Adjustments and Considerations described in Section 2(i) above that UBS used to determine its Submission(s), including, but not limited to, identifying any non-representative transactions excluded from the determination of the Submission(s) and the basis for such exclusions, as well as identifying all transactions given the greatest weight or considered to be the most relevant, and the basis for such conclusion;

  b. All models or other methods used in determining UBS's Submission(s), such as models for credit standards and/or term structure, and any adjustments made to the Submission(s) based on such models or other methods;

  c. Relevant data and information received from interdealer brokers used in connection with determining UBS's Submission(s) including, but not limited to, the following:

    • Identification of the specific offers and bids relied upon by UBS when determining each Submission; and

    • The name of each company and person from whom the information or data is obtained;

  d. UBS's assessment of "reasonable market size" for its Submission(s) (or any other such criteria for the relevancy of transactions to a Benchmark Interest Rate), to the extent that the rules for a Benchmark Interest Rate require that pertinent transactions considered in connection with Submission(s) be of "reasonable market size" (or any other such criteria);

64

e. Information regarding market events considered by UBS in connection with determining its Submission(s), including, without limitation, the following:

- The specific market announcement(s) or event(s); and

- Any effect of such market event(s) on transacted rates, offers or bids in the relevant markets; and

f. The identity of the Submitter(s) who made, and the Supervisor(s) who reviewed, the Submission(s).

- For each Submission, UBS shall retain for a period of five (5) years after the date of each Submission, the following transactional data used by UBS to determine its Submission(s); the data shall be easily accessible and convertible into the Microsoft Excel file format; the data shall include, without limitation, the following to the extent known to UBS at the time of the Submission(s):

  a. Instrument;
  b. Maturity/tenor;
  c. Trade type (*i.e.*, loan/deposit, placing/taking);
  d. Buy/sell indicator;
  e. Transaction date (in mmddyyyy format);
  f. Maturity date (in mmddyyyy format);
  g. Value date (in mmddyyyy format);
  h. Loan effective date;
  i. Customer number;
  j. Currency;
  k. Ticket ID;
  l. Timestamp;
  m. Counterparty A (buyer/bidder);
  n. Counterparty B (seller/offeror);
  o. Nominal/notional size of the transaction;
  p. Interest basis (360/365 day year);
  q. The fixed interest rate; and
  r. Any special or additional terms (*e.g.*, a repurchase agreement or some form of "non-vanilla agreement").

- <u>Transaction Records</u>: UBS shall retain for a period of five (5) years trade transaction records and daily position and risk reports, including (without limitation) monthly and quarterly position and risk reports, related to the trading activities of Submitter(s) and traders who primarily deal in derivatives products that reference a

65

Benchmark Interest Rate; the records and reports shall be easily accessible and convertible into the Microsoft Excel file format.

▪ Requirement To Record Communications: UBS shall record and retain to the greatest extent practicable all of the following communications:

    a. All communications concerning the determination and review of the Submission(s); and

    b. All communications of traders who primarily deal in derivatives products that reference a Benchmark Interest Rate concerning trades, transactions, prices, or trading strategies pertaining to any derivative that references any Benchmark Interest Rate (or the supervision thereof).

The above communications shall not be conducted in a manner to prevent UBS from recording such communications;

Audio communications of Submitters and Supervisors shall be retained for a period of one (1) year. Audio communications of traders who primarily deal in derivatives products that reference a Benchmark Interest Rate, and who are located at least in the London, Zurich, Tokyo, and Stamford, Connecticut office of UBS, shall be retained for a period of six (6) months. Subject to a reasonable time to implement, UBS's audio retention requirements pursuant to these Undertakings shall commence within a reasonable period after the entry of this Order and shall continue for a period of five (5) years thereafter;

All communications except audio communications shall be retained for a period of five (5) years; and

Nothing in these Undertakings shall limit, restrict or narrow any obligations pursuant to the Act or the Commission's Regulations promulgated thereunder, including but not limited to Regulations 1.31 and 1.35, 17 C.F.R. §§ 1.31 and 1.35 (2012), in effect now or in the future.

vi. MONITORING AND AUDITING:

▪ Monitoring: UBS shall maintain or develop monitoring systems or electronic exception reporting systems that identify possible improper or unsubstantiated Submissions. Such reports will be reviewed on at least a weekly basis and, if there is any significant deviation or issues, the underlying documentation for the Submission shall be reviewed to determine whether the

Submission is adequately substantiated.  If it is not substantiated, UBS shall notify its chief compliance officer(s) and the Benchmark Publisher;

- Periodic Audits:  Starting six (6) months from the date of the entry of this Order and continuing every six (6) months thereafter, unless an annual audit is scheduled at the same time, UBS shall conduct internal audits of reasonable and random samples of its Submission(s), the factors and all other evidence documenting the basis for such Submission(s), and communications of the Submitter(s) in order to verify the integrity and reliability of the process for determining Submission(s); and

- Annual Audits By Third Party Auditors:  Starting one (1) year from the date of the entry of this Order and continuing annually for four (4) additional years thereafter, UBS shall retain an independent, third-party auditor to conduct an audit of its Submission(s) and the process for determining Submission(s), which shall include, without limitation, the following:

  a. Reviewing communications of Submitter(s) and Supervisor(s);

  b. Interviewing the Submitter(s) and Supervisor(s), to the extent they are still employed by UBS;

  c. Obtaining written verification from the Submitter(s) and Supervisor(s), to the extent they are still employed by UBS, that the Submission(s) were consistent with this Order, the policies and procedures in place for making UBS's Submission(s), and the definitions applicable to the Benchmark Interest Rate for which UBS made Submission(s); and

  d. A written audit report to be provided to UBS and the Commission (with copies addressed to the Commission's Division of Enforcement (the "Division")).

vii. POLICIES, PROCEDURES AND CONTROLS:  Within sixty (60) days of the entry of this Order, UBS shall develop policies, procedures and controls to comply with each of the specific Undertakings set forth above with the goal of ensuring the integrity and reliability of its Submission(s). In addition, UBS shall develop policies, procedures and controls to ensure the following:

- The supervision of the Submission process;

67

- That any violations of the Undertakings or any questionable, unusual or unlawful activity concerning UBS's Submissions are reported to and investigated by UBS's compliance or legal personnel and reported, as necessary, to authorities and the Benchmark Publishers;

- The periodic but routine review of electronic communications and audio recordings of or relating to the Submission Process;

- The periodic physical presence of compliance personnel on the trading floors of the Submitter(s) and/or traders who primarily deal in derivatives products that reference a Benchmark Interest Rate to observe and ensure compliance with these Policies, Procedures and Controls, which shall be conducted not less than monthly;

- The handling of complaints concerning the accuracy or integrity of UBS's Submission(s) including:

  a. Memorializing all such complaints;

  b. Review and follow-up by the chief compliance officer(s) or his designee of such complaints; and

- The reporting of material complaints to the Chief Executive Officer and Board of Directors, relevant self-regulatory organizations, the relevant Benchmark Publisher, the Commission, and/or other appropriate regulators.

viii. <u>TRAINING</u>: UBS shall develop training programs for all employees who are involved in its Submission(s), including, without limitation, Submitters and Supervisors, and all traders who primarily deal in derivatives products that reference a Benchmark Interest Rate. Submitters and Supervisors shall be provided with preliminary training regarding the policies, procedures and controls developed pursuant to Section 2(vii) of these Undertakings. By no later than September 20, 2013, all Submitters, Supervisors and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate shall be fully trained in the application of these Undertakings to them, as set forth herein. Thereafter, such training will be provided promptly to employees newly assigned to any of the above listed responsibilities, and again to all Submitters, Supervisors and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate as part of UBS's regular training programs. The training shall be based upon the individual's position and responsibilities, and as appropriate, address the following topics:

- The Undertakings set forth herein;

68

- The process of making Submission(s);

- The impropriety of attempting to influence the determination of UBS's Submission(s);

- The requirement to conduct all business related to UBS's Submission(s) on UBS's recorded telephone and electronic communications systems, and not on personal telephones or other electronic devices, as set forth in Section 2(v) of these Undertakings;

- The requirement to conduct certain business related to derivatives products that reference a Benchmark Interest Rate on UBS's recorded telephone and electronic communications systems, and not on personal devices or systems, as set forth in Section 2(v) of these Undertakings;

- The policies and procedures developed and instituted pursuant to these Undertakings; and

- The employment and other potential consequences if employees act unlawfully or improperly in connection with UBS's Submission(s) or process for determining Submission(s).

ix. REPORTS TO THE COMMISSION:

- Compliance with Undertakings: Every four (4) months, starting 120 days from the entry of this Order, UBS shall make interim reports to the Commission, through the Division, explaining its progress towards compliance with the Undertakings set forth herein. Within 365 days of the entry of this Order, UBS shall submit a report to the Commission, through the Division, explaining how it has complied with the Undertakings set forth herein. The report shall attach copies of and describe the internal controls, policies and procedures that have been designed and implemented to satisfy the Undertakings. The report shall contain a certification from a representative of UBS's Executive Management, after consultation with UBS's chief compliance officer(s), that UBS has complied with the Undertakings set forth above, and that it has established policies, procedures and controls to satisfy the Undertakings set forth in the Order;

- Submitter(s), Supervisor(s), and Heads of Appropriate Trading Desks: Within fourteen (14) days of the entry of this Order, or as soon as practicable thereafter, UBS shall provide, meet with and explain these Undertakings to all Submitters, Supervisors and the head of each trading desk that primarily deals in derivatives that

reference a Benchmark Interest Rate. Within that same time frame, UBS shall provide to the Commission, through the Division, written or electronic affirmations signed by each Submitter, Supervisor, and head of each trading desk that primarily deals in derivatives that reference a Benchmark Interest Rate, stating that he or she has received and read the Order and Undertakings herein, and that he or she understands these Undertakings to be effective immediately; and

- <u>Disciplinary and Other Actions</u>: UBS shall promptly report to the Commission, through the Division, all improper conduct related to any Submission(s) or the attempted manipulation or manipulation of a Benchmark Interest Rate, as well as any disciplinary action, or other law enforcement or regulatory action related thereto, unless *de minimis* or otherwise prohibited by applicable laws or regulations.

3. DEVELOPMENT OF RIGOROUS STANDARDS FOR BENCHMARK INTEREST RATES

To the extent UBS is or remains a contributor to any Benchmark Interest Rate, UBS agrees to make its best efforts to participate in efforts by current and future Benchmark Publishers, other price reporting entities and/or regulators to ensure the reliability of Benchmark Interest Rates, and through its participation to encourage the following:

i. <u>METHODOLOGY</u>: Creating rigorous methodologies for the contributing panel members to formulate their Submissions. The aim of such methodologies should be to result in a Benchmark Interest Rate that accurately reflects the rates at which transactions are occurring in the market being measured by that Benchmark Interest Rate;

ii. <u>VERIFICATION</u>: Enforcing the use of those methodologies through an effective regime of documentation, monitoring, supervision and auditing, required by and performed by the Benchmark Publishers, and by the contributing panel members internally;

iii. <u>INVESTIGATION</u>: Facilitating the reporting of complaints and concerns regarding the accuracy or integrity of Submissions to Benchmark Interest Rates or the published Benchmark Interest Rate, and investigating those complaints and concerns thoroughly;

iv. <u>DISCIPLINE</u>: Taking appropriate action if, following a thorough confidential investigation, the Benchmark Publisher determines that a complaint or concern regarding the accuracy or integrity of a Submission or the published Benchmark Interest Rate has been substantiated;

v.  <u>TRANSPARENCY</u>:  Making regular reports to the public and the markets of facts relevant to the integrity and reliability of each Benchmark Interest Rate.  Such reports should include, but not be limited to, the following:

- At the time each Benchmark Interest Rate is published, the Benchmark Publisher should display prominently whether each rate is based entirely on transactions in the market the rate is supposed to reflect, or whether it instead is based, in whole or in part, on other data or information;

- The Benchmark Publisher also should make periodic reports regarding the number and nature of complaints and concerns received regarding the accuracy or integrity of Submissions or the published Benchmark Interest Rate while maintaining the anonymity of all those who have reported or are the subject of complaints and concerns;

- The Benchmark Publisher should additionally make periodic reports regarding the results of all investigations into such complaints and concerns while maintaining the anonymity of all those involved in investigations that have not yet been completed; and

vi.  <u>FORMULATION</u>:  Periodically examining whether each Benchmark Interest Rate accurately reflects the rate at which transactions are occurring in the market being measured (using the statistical method prescribed by that Benchmark Interest Rate), and evaluating whether the definition and instructions should be revised, or the composition of the panel changed;

Such examinations should include a rigorous mathematical comparison of transactions in the relevant market with the published Benchmark Interest Rate on the same day over a specified period, and a determination of whether any differences are statistically or commercially significant.

UBS shall report periodically, on at least a quarterly basis, to the Commission, through the Division, either orally or in writing, on its participation in such efforts, to the extent that such reporting is not otherwise prohibited by law or regulations, by the rules issued by Benchmark Publishers, or by nondisclosure agreements by and between UBS and Benchmark Publishers.

4.  COOPERATION WITH THE COMMISSION

i.  Respondents shall cooperate fully and expeditiously with the Commission, including the Division, and any other governmental agency in this action, and in any investigation, civil litigation, or administrative matter related to the subject matter of this action or any current or future Commission

71

investigation related thereto.  As part of such cooperation, Respondents agree to the following for a period of five (5) years from the date of the entry of this Order, or until all related investigations and litigation are concluded, including through the appellate review process, whichever period is longer:

- Preserve all records relating to the subject matter of this proceeding, including, but not limited to, audio files, electronic mail, other documented communications, and trading records;

- Comply fully, promptly, completely, and truthfully with all inquiries and requests for information or documents;

- Provide authentication of documents and other evidentiary material;

- Provide copies of documents within UBS's possession, custody or control;

- Subject to applicable laws and regulations, UBS will make its best efforts to produce any current (as of the time of the request) officer, director, employee, or agent of UBS, regardless of the individual's location, and at such location that minimizes Commission travel expenditures, to provide assistance at any trial, proceeding, or Commission investigation related to the subject matter of this proceeding, including, but not limited to, requests for testimony, depositions, and/or interviews, and to encourage them to testify completely and truthfully in any such proceeding, trial, or investigation; and

- Subject to applicable laws and regulations, UBS will make its best efforts to assist in locating and contacting any prior (as of the time of the request) officer, director, employee or agent of UBS;

ii.   UBS also agrees that it will not undertake any act that would limit its ability to cooperate fully with the Commission.  UBS will designate an agent located in the United States of America to receive all requests for information pursuant to these Undertakings, and shall provide notice regarding the identity of such agent to the Division upon entry of this Order.  Should UBS seek to change the designated agent to receive such requests, notice of such intention shall be given to the Division fourteen (14) days before it occurs.  Any person designated to receive such request shall be located in the United States of America; and

iii.  UBS and the Commission agree that nothing in these Undertakings shall be construed so as to compel UBS to continue to contribute Submission(s)

72

related to any Benchmark Interest Rate.  Without prior consultation with the Commission, UBS remains free to withdraw from the panel of contributors to any Benchmark Interest Rate.

5.  PROHIBITED OR CONFLICTING UNDERTAKINGS

Should the Undertakings herein be prohibited by, or be contrary to the provisions of any obligations imposed on UBS by any presently existing, or hereinafter enacted or promulgated laws, regulations, regulatory mandates, or the rules or definitions issued by a Benchmark Publisher, then UBS shall promptly transmit notice to the Commission (through the Division) of such prohibition or conflict, and shall meet and confer in good faith with the Commission (through the Division) to reach an agreement regarding possible modifications to the Undertakings herein sufficient to resolve such inconsistent obligations.  In the interim, UBS will abide by the obligations imposed by the law, regulations, regulatory mandates and Benchmark Publishers' rules and definitions.  Nothing in these Undertakings shall limit, restrict or narrow any obligations pursuant to the Act or the Commission's Regulations promulgated thereunder, including, but not limited to, Regulations 1.31 and 1.35, 17 C.F.R. §§ 1.31 and 1.35 (2012), in effect now or in the future.

6.  PUBLIC STATEMENTS

Respondents agree that neither they nor any of their successors and assigns, agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondents' (i) testimonial obligations, or (ii) right to take positions in other proceedings to which the Commission is not a party.  Respondents and their successors and assigns shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

D.  Partial Satisfaction:  Respondents understand and agree that any acceptance by the Commission of partial payment of Respondents' CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

**The provisions of this Order shall be effective as of this date.**

By the Commission.

_____

73

# 𝕵ₐ Financial Services Agency

(Provisional Translation)
December 16, 2011
Financial Services Agency

## Administrative Actions against UBS Securities Japan Ltd and UBS AG, Japan Branches

### I. UBS Securities Japan Ltd

The Securities and Exchange Surveillance Commission (SESC) conducted an inspection on UBS Securities Japan Ltd (hereinafter referred to as the "Company"), and found a violation of the Financial Instruments and Exchange Act (hereinafter referred to as the "FIEA"). On December 9, 2011, the SESC recommended to take administrative action against the Company.

On the basis of the violation, the FSA today issued the following administrative action against the Company based on Article 51 and Article 52 (1) of the FIEA.

1. Descriptions of the Recommendation

  - Inappropriate actions related to Euroyen TIBOR (hereinafter referred to as "TIBOR")

    A yen rates trader at the Rates Department of the Fixed Income, Currencies and Commodities Division in the Company (at that time; hereinafter referred to as "Trader A") had continuously conducted such approaches as requesting a person in charge of submitting the TIBOR rates of UBS AG, Tokyo Branch (hereinafter referred to as "Submitting Personnel") to change its rates since around March 2007 at the latest, and also had continuously conducted such approaches as requesting persons in charge of submitting the TIBOR rates of other banks (hereinafter, including Submitting Personnel, referred to as "Submitting Personnel, etc.") since around February 2007 at the latest, for the purpose of fluctuating TIBOR so as to give advantages to the Derivative Transactions related to yen rates that Trader A was conducting.

    The actions conducted by Trader A are acknowledged to be seriously unjust and malicious, and could undermine the fairness of the markets, considering that three-month TIBOR is the underlying asset of Three-month Euroyen Futures listed on Tokyo Financial Exchange Inc., Trader A conducted transactions of Three-month Euroyen Futures on Tokyo Financial Exchange Inc., and TIBOR is a significantly important financial index as a basic interest rate when banks raise or lend money. Therefore, the aforementioned actions conducted by Trader A are acknowledged to have a serious problem from the viewpoints of the public interest and protection of investors.

    Furthermore, Trader A had also continuously conducted inappropriate approaches, such as requesting to change the Yen-LIBOR rates that UBS group submitted, since around June 2007 at the latest.

    The Company's internal control system is also acknowledged to have a serious problem, since the approaches have been overlooked for long periods and no appropriate measures have been taken.

As mentioned above, i) Trader A is acknowledged to have conducted approaches against Submitting Personnel, etc. for Market Derivatives Transactions, which he was conducting under the Company's proprietary trading legally defined as Financial Instruments Business, ii) the actions are acknowledged to be unjust and malicious, from the viewpoints of the public interest and protection of investors, and could undermine the fairness of the markets, iii) Trader A conducted approaches regarding not only TIBOR but also Yen-LIBOR, and iv) the Company's internal control system is acknowledged to have a serious problem. Therefore, the Company's actions are acknowledged to fall under Article 52, paragraph 1 (ix) of the Financial Instruments and Exchange Act, which stipulates "when a wrongful act or extremely unjust act has been conducted with regard to Financial Instruments Business, and when the circumstances are especially serious."

2. Description of Administrative Actions

(1) Business Suspension Order

Suspend the Company's derivative transactions related to TIBOR and LIBOR from January 10 to January 16, 2012 (excluding transactions necessary for the termination of existing contracts, etc)

(2) Business Improvement Order

(a) Clarify the responsibility of the management and staff regarding the violation.

(b) Secure strict compliance by all the management and staff members.

(c) Take preventive measures against recurrence of the above-mentioned violations, including measures to improve the control environment for governance and business operation.

(d) Submit a written report to the FSA on the implementation of (i) the above measures ((a) - (c)) by January 16, 2012, and (ii) (b) and (c) by March 30, 2012, every three months thereafter, and at any times as needed in consideration of the implementation status.

## II. UBS AG, Japan Branches

Based on the results of the inspection of UBS AG, Japan Branches (hereinafter referred to as the "Bank") and the report it submitted, the Financial Services Agency (FSA) today took the following administrative actions against the Bank in order to ensure sound and appropriate business operations.

1. Reasons for the Administrative Actions

According to the on-site inspection (notification made on November 22, 2011) and a report submitted by the Bank pursuant to the provisions of Article 24(1) and Article 48 of the Banking Act, an employee of the Bank's Tokyo branch has continuously received approaches from an employee of UBS Securities Japan Ltd, including requests regarding the TIBOR rate submission.

However, this was not reported to the Bank's management team as an inappropriate practice, indicating that there are problems related to the internal control system.

2. Description of Administrative Actions

Orders based on Article 47(2) and (4) and Article 26(1) of the Banking Act.

(1) Take the following measures to ensure sound and appropriate business operations.

(i) Ensure thorough compliance with laws and regulations by executives and employees.

(ii) Strengthen the internal control system.

(iii) Formulate measures to prevent the recurrence of problems.

(2) Submit a business improvement plan concerning (1) above and the matters described in the order for the submission of a report by January 31, 2012, and immediately implement the plan.

(3) Following the implementation of (2) above, sum up the progress and implementation of the business improvement plan and the status of improvements through January 30, 2012, and report on the findings by the 15th day of the following month (1st report), and subsequently submit similar reports every three months by the 15th day of the respective following months, until the business improvement plan is completed.

---

**Contact**

Financial Services Agency
Tel +81-(0)3-3506-6000 (main)
Securities Business Division, Supervisory Bureau (ext. 3370, 3356)

Banks Division I, Supervisory Bureau (ext. 3751, 3398)

**EXHIBIT 3**
**Factual Basis for Plea**

1.    The following Statement of Facts is incorporated by reference as part of the Plea Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and UBS SECURITIES JAPAN CO., LTD. ("UBS Securities Japan" or "UBSSJ"), and the parties hereby agree and stipulate that the following information is true and accurate.  UBS Securities Japan, admits, accepts, and acknowledges that it is responsible for the acts of its predecessor company's officers, employees, and agents as set forth below.  Had this matter proceeded to trial, the Fraud Section would have proven beyond a reasonable doubt, by admissible evidence, the facts set forth below and alleged in the criminal Information.  This evidence would establish the following, within the time period specified in the Information:

1.    The predecessor of UBSSJ, which is also referred to herein as UBSSJ, was a wholly owned subsidiary of UBS AG. UBSSJ was based in Tokyo, Japan, and it engaged in investment banking and wealth management activities.

2.    UBSSJ employed derivatives traders who entered into trades, on behalf of UBSSJ, with counterparties.  The profitability of those trades was tied to movements in benchmark interest rates – including, specifically, (a) the London

1

Interbank Offered Rate ("LIBOR") calculated for the Yen and (b)
the Euroyen Tokyo Interbank Offered Rate ("TIBOR").  These Yen
benchmarks are discussed at greater length in Exhibit 4, which is
attached to the Agreement.

     3.    Derivatives traders who worked at UBSSJ (the
"derivatives traders") engaged in a scheme to defraud UBS's
counterparties by secretly manipulating Yen LIBOR and TIBOR.

     4.    They carried out this scheme by making efforts to
manipulate: (a) the Yen LIBOR and TIBOR submissions that UBS
transmitted to Thomson Reuters, which calculated and published
LIBOR rates on behalf of the British Bankers Association and
TIBOR rates on behalf of the Japanese Bankers Association; and
(b) the Yen LIBOR submissions that other banks transmitted to
Thomson Reuters.

     5.    Through those efforts, the Yen derivatives traders
sought to influence, and on some occasions did influence, the
published Yen LIBOR and TIBOR rates by providing false and
misleading submissions to Thomson Reuters, which were then
incorporated into the calculation of the final published rates.
The derivatives traders engaged in this conduct in order to
benefit their trading positions by maximizing their profits and
minimizing their losses.  As these derivatives traders
understood, they could only achieve those goals at the expense of

their counterparties, whose trading positions would be affected to the same extent but in the opposite direction.  The derivatives traders did not inform their counterparties that the traders were engaging in efforts to manipulate the Yen benchmarks to which the profitability of their trades was tied.

6.  In light of the large notional values that form the basis for many derivatives trades, even small movements in the relevant benchmark rates can have a substantial impact on the profitability of trading positions.

7.  To the extent that derivatives traders were able to manipulate a bank's Yen LIBOR or TIBOR submissions, those submissions were false and misleading because they did not reflect the bank's actual and honest assessment of what its submission should have been based on the applicable definitions of the benchmark rates.

8.  The derivatives traders also entered into trades with counterparties after they had initiated, and while they planned to continue, their efforts to manipulate Yen LIBOR and TIBOR.

9.  From the perspective of a counterparty, information that a derivatives trader on the opposite side of a trade was engaging in efforts to manipulate the benchmark rate to which the trade was tied was material.  False and misleading Yen

LIBOR or TIBOR submissions that could affect the relevant
published benchmark rate were also material from a counterparty's
perspective.

10.  UBSSJ employees who participated in the conduct
described above devised and carried out a deceptive scheme to
defraud their counterparties, and to obtain money and property
from their counterparties by means of materially false and
fraudulent pretenses and representations, knowing that they were
false and fraudulent when made and acting with fraudulent intent.

11.  In furtherance of that scheme, on or about
February 25, 2009, a derivatives trader employed by UBSSJ
(referred to herein and in Exhibit 4 as "Trader-1") engaged in an
electronic chat with an employee of an interdealer brokerage firm
(referred to herein and in Exhibit 4 as "Broker-B").  During the
chat, Trader-1 asked Broker-B to help influence Yen LIBOR
submitters at other banks to contribute submissions that would
benefit Trader-1's trading positions.  In response, Broker-B
indicated that he would do so.  The chat was transmitted through,
among other locations and facilities, a UBS server located in
Stamford, Connecticut.  Following the chat, Broker-B spoke by
telephone with a Yen LIBOR submitter at a bank other than UBS
(referred to herein and in Exhibit 4 as Submitter-F and Bank-F,
respectively).  During that call, Broker-B asked Submitter-F to

alter the submitter's contribution for Yen LIBOR for a particular maturity (or "tenor") in a manner that was consistent with Trader-1's request to Broker-B.  Submitter-F acceded to Broker-B's request by changing the Yen LIBOR contribution from Bank-F in that tenor.  Bank-F's LIBOR submissions were then transmitted to Thomson Reuters, which calculated and published the daily LIBOR rates and transmitted those rates electronically to locations around the world.  As a result of the change in Bank-F's submission that occurred because of these events, a published Yen LIBOR rate was affected.

## EXHIBIT 4

**STATEMENT OF FACTS**

1.   The following Statement of Facts is incorporated by reference as part of the Plea Agreement between the United States Department of Justice, Criminal Division, Fraud Section ("Fraud Section") and UBS SECURITIES JAPAN CO., LTD. ("UBS Securities Japan" or "UBSSJ"), and the parties hereby agree and stipulate that the following information is true and accurate. UBS Securities Japan, admits, accepts, and acknowledges that it is responsible for the acts of its predecessor company's officers, employees, and agents as set forth below.  Had this matter proceeded to a sentencing hearing, the Department would have proven, by the applicable standard of proof and by admissible evidence, the facts alleged below and set forth in the criminal Information.  This evidence would establish the following:

I.

<u>BACKGROUND</u>

A.   <u>*LIBOR and Euroyen TIBOR*</u>

2.   Since its inception in approximately 1986, the London Interbank Offered Rate ("LIBOR") has been a benchmark interest rate used in financial markets around the world.  Futures, options, swaps, and other derivative financial instruments traded in the over-the-counter market and on exchanges worldwide

1

are settled based on LIBOR.  The Bank of International Settlements has estimated that in the second half of 2009, for example, the notional amount of over-the-counter interest rate derivative contracts was valued at approximately $450 trillion. In addition, mortgages, credit cards, student loans, and other consumer lending products often use LIBOR as a reference rate.

3.      LIBOR is published under the auspices of the British Bankers' Association ("BBA"), a trade association with over 200 member banks that addresses issues involving the United Kingdom banking and financial services industries.  The BBA defines LIBOR as:

> The rate at which an individual Contributor Panel bank could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11:00 [a.m.] London time.

This definition has been in place since approximately 1998.

4.      LIBOR rates were initially calculated for three currencies:  the United States Dollar, the British Pound Sterling, and the Japanese Yen.  Over time, the use of LIBOR expanded, and benchmark rates were calculated for ten currencies, including the original three.

5.      The LIBOR for a given currency is the result of a calculation based upon submissions from a panel of banks for that currency (the "Contributor Panel") selected by the BBA.

Each member of the Contributor Panel submits its rates every London business day through electronic means to Thomson Reuters, as an agent for the BBA, by 11:10 a.m. London time.  Once each Contributor Panel bank has submitted its rate, the contributed rates are ranked.  The highest and lowest quartiles are excluded from the calculation, and the middle two quartiles (i.e., 50% of the submissions) are averaged to formulate the resulting LIBOR "fix" or "setting" for that particular currency and maturity.

6.     The LIBOR contribution of each Contributor Panel bank is submitted to between two and five decimal places, and the LIBOR fix is rounded, if necessary, to five decimal places. In the context of measuring interest rates, one "basis point" (or "bp") is one-hundredth of one percent (0.01%).

7.     Thomson Reuters calculates and publishes the rates each business day by approximately 11:30 a.m. London time. Fifteen maturities (or "tenors") are quoted for each currency, ranging from overnight to twelve months.  The published rates are made available worldwide by Thomson Reuters and other data vendors through electronic means and through a variety of information sources.  In addition to the LIBOR fix resulting from the calculation, Thomson Reuters publishes each Contributor Panel bank's submitted rates along with the names of the banks.

8.     According to the BBA, each Contributor Panel bank must submit its rate without reference to rates contributed by

3

other Contributor Panel banks.  The basis for a Contributor

Panel bank's submission, according to a clarification the BBA

issued in June 2008, must be the rate at which members of the

bank's staff primarily responsible for management of the bank's

cash, rather than the bank's derivative trading book, consider

that the bank can borrow unsecured inter-bank funds in the

London money market.  Further, according to the BBA, a

Contributor Panel bank may not contribute a rate based on the

pricing of any derivative financial instrument.  In other words,

a Contributor Panel bank's LIBOR submissions should not be

influenced by its motive to maximize profit or minimize losses

in derivatives transactions tied to LIBOR.

     9.    The Contributor Panel for Japanese Yen ("Yen") LIBOR

from at least 2005 through 2010 was comprised of 16 banks,

including UBS AG.

     10.   From at least 2005 until 2012, UBS AG was also a

member of the Contributor Panel for the Euroyen Tokyo Interbank

Offered Rate ("TIBOR").  TIBOR is a reference rate overseen by

the Japanese Bankers Association ("JBA"), which is based in

Tokyo, Japan.  While UBS was a member of the panel, the Euroyen

TIBOR Contributor Panel was comprised of 16 banks.  The term

"Euroyen" refers to Yen deposits maintained in accounts outside

of Japan.  Euroyen TIBOR is what Contributor Panel banks deem to

be prevailing lending market rates between prime banks in the

Japan Offshore Market as of 11:00 a.m. Tokyo time.  Euroyen
TIBOR is calculated by discarding the two highest and two lowest
submissions, and averaging the remaining rates.  The published
rates, and each Contributor Panel bank's submitted rates, are
made available worldwide through electronic means and through a
variety of information sources.

11.  Because of the widespread use of LIBOR and other
benchmark interest rates in financial markets, these rates play
a fundamentally important role in financial systems around the
world.

B.   *Interest Rate Swaps and Euroyen Futures Contracts*

12.  An interest rate swap ("swap") is a financial
derivative instrument in which two parties agree to exchange
interest rate cash flows.  If, for example, a party has a
transaction in which it pays a fixed rate of interest but wishes
to pay a floating rate of interest tied to a reference rate, it
can enter into an interest rate swap to exchange its fixed rate
obligation for a floating rate one.  Commonly, for example,
Party A pays a fixed rate to Party B, while Party B pays a
floating interest rate to Party A indexed to a reference rate
like LIBOR.  There is no exchange of principal amounts, which
are commonly referred to as the "notional" amounts of the swap
transactions.  Interest rate swaps are traded over-the-counter;

in other words, they are negotiated in transactions between counterparties and are not traded on exchanges.

13.   Euroyen futures contracts are traded on the Chicago Mercantile Exchange ("CME") and other exchanges around the world, and are settled based on Euroyen TIBOR.   A Euroyen futures contract is essentially the interest that would be paid on a Euroyen deposit of ¥100,000,000 for a term of three months. The actual settlement price of a 3-month contract is calculated as 100 minus the 3-month Euroyen TIBOR on the settlement date. Most Euroyen futures contracts settle on four quarterly International Monetary Market ("IMM") dates, which are the third Wednesday of March, June, September, and December.   The last trading days are the second London bank business day prior to the third Wednesday (i.e., usually Monday) in those months. From 2007 through 2011, according to the CME, more than 758,000 Euroyen TIBOR futures contracts were traded on the CME.

14.   The market for derivatives and other financial products linked to benchmark interest rates for the Yen is global and is one of the largest and most active markets for such products in the world.   A number of these products are traded in the United States – such as the Euroyen TIBOR futures contract traded on the CME – in transactions involving U.S.-based counterparties.   For example, a meaningful portion of the total value of the transactions entered into by UBSSJ's most

successful Yen derivatives trader from 2007 through 2009
("Trader-1") involved U.S.-based counterparties.

C.   *UBS AG and UBS Securities Japan Co., Ltd.*

15.   UBS AG is a financial services corporation with
headquarters located in Zurich, Switzerland.  UBS AG has banking
divisions and subsidiaries around the world, including in the
United States, with its United States headquarters located in
New York, New York and Stamford, Connecticut.  One of its
divisions is the Investment Bank, which operates through a
number of legal entities including defendant UBS Securities
Japan Co., Ltd. – which is a wholly-owned subsidiary of UBS AG
that engages in investment banking and wealth management.  UBS
AG employs derivatives traders throughout the world – including
in Stamford, London, Zurich, and Tokyo – who trade financial
instruments tied to LIBOR and Euroyen TIBOR, including interest
rate swaps and Euroyen futures contracts ("derivatives
traders").

D.   *UBS's LIBOR and Euroyen TIBOR Submissions*

16.   At various times from at least 2006 through June 2010,
certain UBSSJ derivatives traders – whose compensation from
UBSSJ was directly connected to their success in trading
financial products tied to LIBOR and Euroyen TIBOR – directly or
indirectly exercised improper influence over UBS's submissions
for those benchmark interest rates.

II.

UBSSJ'S MANIPULATION
OF LIBOR AND EUROYEN TIBOR SUBMISSIONS

17.   From as early as 2006 through at least June 2010,
certain UBSSJ derivatives traders requested and obtained
benchmark interest-rate submissions which benefited their
trading positions.  This conduct occurred frequently beginning
in 2006, in Zurich, Tokyo, and elsewhere, when several UBSSJ
employees engaged in sustained, wide-ranging, and systematic
efforts to manipulate Yen LIBOR and, to a lesser extent, Euroyen
TIBOR, to benefit UBSSJ's trading positions.  This conduct
encompassed hundreds of instances in which UBS and UBSSJ
employees sought to influence benchmark rates; during some
periods, UBS and UBSSJ employees engaged in this activity on
nearly a daily basis.  In furtherance of these efforts to
manipulate Yen benchmarks, UBS and UBSSJ employees used several
principal and interrelated methods, including the following:

    a)   internal manipulation of UBS's Yen LIBOR and Euroyen
         TIBOR submissions;

    b)   use of cash brokers to influence other Contributor
         Panel banks' Yen LIBOR submissions by disseminating
         misinformation; and

    c)   efforts to collude directly with employees at other
         Contributor Panel banks, either directly or through
         brokers, in order to influence those banks' Yen LIBOR
         submissions.

8

Details and examples of this conduct are set forth below.

A. *Manipulation of UBS's Yen LIBOR and TIBOR Submissions*

   1) *Yen LIBOR*

   18.   The manipulation of Yen LIBOR submissions to benefit
UBSSJ derivatives traders' positions began to occur frequently
after July 2006, when UBSSJ hired Trader-1, a Tokyo-based Yen
derivatives trader.  Beginning in September 2006, and continuing
until soon before he left UBSSJ in September 2009, Trader-1, and
occasionally other of UBSSJ's Yen derivatives traders, regularly
requested that UBS's Yen LIBOR submitters contribute LIBOR
submissions to benefit their trading books.  Trader-1 and
his/her colleagues engaged in this conduct on the majority of
total trading days during this more-than-three-year period.

   19.   These derivatives traders requested, and sometimes
directed, that certain UBS LIBOR and Euroyen TIBOR submitters
submit benchmark interest rate contributions that would benefit
the traders' trading positions, rather than rates that complied
with the definitions of LIBOR and Euroyen TIBOR.  Those
derivatives traders either requested or directed a particular
LIBOR and Euroyen TIBOR contribution for a particular tenor and
currency, or requested that the rate submitter contribute a rate
higher, lower, or unchanged for a particular tenor and currency.
The derivatives traders made these requests in electronic
messages, telephone conversations, and in-person conversations.

9

The LIBOR and Euroyen TIBOR submitters regularly agreed to accommodate the derivatives traders' requests and directions for favorable benchmark interest rate submissions.

20.   For example, on Monday, November 20, 2006, Trader-1 asked the UBS Yen LIBOR submitter ("Submitter-3"), who was substituting for the regular submitter ("Submitter-1") that day, "hi . . . [Submitter-1] and I generally coordinate ie sometimes trade if ity [sic] suits, otherwise skew the libors a bit." Trader-1 went on to request, "really need high 6m [6-month] fixes till Thursday." Submitter-3 responded, "yep we on the case there . . . will def[initely] be on the high side." The day before this request, UBS's 6-month Yen LIBOR submission had been tied with the lowest submissions included in the calculation of the LIBOR fix. Immediately after this request for high submissions, however, UBS's 6-month Yen LIBOR submissions rose to the highest submission of any bank in the Contributor Panel and remained tied for the highest until Thursday — as Trader-1 had requested.

21.   In early 2007, a new UBS Yen LIBOR submitter ("Submitter-2") received training from Submitter-1, who was a UBS manager[1] and Yen derivatives trader.  During that training, Submitter-2 was instructed that the primary factor in

---

[1] The terms "senior manager" or "manager," as used herein, do not include members of the board of directors, executive board, or executive management.

determining UBS's Yen LIBOR submissions each day was the UBSSJ
Yen derivatives traders' requests, which were to be
accommodated.  Submitter-2 followed that directive, and
accommodated Trader-1 and other UBSSJ Yen derivatives traders'
requests for LIBOR submissions through July 2009, when
Submitter-2's responsibilities at UBS changed.

22.  From at least August 2007 and at various times through
at least September 2009, the manager of one of the Yen
derivatives trading desks in Tokyo exerted pressure on Yen LIBOR
submitters to take derivatives traders' positions into account
when setting Yen LIBOR.  Yen derivatives traders routinely
requested that the submitters contribute Yen LIBOR submissions
to benefit their trading books, and the submitters, in
accordance with the instructions from their superiors at UBS,
accommodated derivatives traders' requests.

23.  An example of such an accommodation occurred on March
29, 2007, when Trader-1 asked Submitter-1, "can we go low
3[month] and 6[month] pls?  . . .  3[month] esp." Submitter-1
responded "ok", and then the two had the following exchange by
electronic chat:

        Trader-1:    what are we going to set?
        Submitter-1: too early to say yet . . .  prob[ably]  .69
                     would be our unbiased contribution
        Trader-1:    ok wd really help if we cld keep 3m low pls

11

> Submitter-1: as i said before - i [don't] mind helping on
> your fixings, but i'm not setting libor 7bp
> away from the truth. . .  i'll get ubs
> banned if i do that, no interest in that.
>
> Trader-1:   ok obviousl;y [sic] no int[erest] in that
> happening either . . . not asking for it to
> be 7bp from reality anyway any help
> appreciated[.]

Trader-1 received the help he requested.  Although Submitter-1's "unbiased contribution" of the 3-monthYen LIBOR submission would have been .69 that day, he lowered his/her submission to .67, as Trader-1 requested.

24.  As another example, a series of electronic chats between March 12 and 17, 2008, demonstrates that Trader-1 caused UBS's Yen LIBOR submission to move 3 basis points over a 5 day period.  On Wednesday, March 12, 2008, Trader-1 asked Submitter-2 to raise the 3-month Yen LIBOR submission from the previous day's .99 contribution, because "we have [$2 million] usd fix in 3[month] on Monday [March 17] per bp."[2]  Submitter-2 responded: "with yesterdays .99 i was already on the very high side.  i need to go down a touch lower on the back to what happened yesterday. . . thought about .97."  Trader-1 responded: "cool no

---

[2]Although, as stated above, the term "fix" is often used to refer to the calculated and published benchmark rate, in the context of this chat, the trader's "fix" refers to the settlement or "fixing" of derivatives trading positions.  The reference to "usd" is to the monetary value of such settled positions, designated in U.S. Dollars.

chance of .98?  anyway the actual fix is Monady [sic] [March 17]
so that's the key day."[3]  Although Submitter-2 had intended to
drop his/her LIBOR contribution down to .97 on March 12, he
instead raised his/her LIBOR submission to .98.  The following
day, he raised it again to .99, and on Monday, March 17, the
following exchange occurred:

> Trader-1:    been chatting with [your supervisor] . . . can
>              we go . . . high 3[month] . . . obviously with
>              the size of the fix today and confusion over
>              levels if we could push it a bit more than
>              usual it would be great
>              ****
> Submitter-2: Friday fixed 3mt at 0.99
> Trader-1:    thx [Submitter-2]
> Submitter-2: shall I go fro [sic] 1%?
> Trader-1:    pls
> Submitter-2: ok will do

As promised, Submitter-2 contributed a Yen LIBOR submission of
1% that day, 3 basis points higher than where he had intended to
submit a few days earlier.

    25.  In a March 28, 2008 electronic chat between Trader-1
and Submitter-2, Trader-1 was again successful in manipulating
UBS's LIBOR submission to benefit his trading positions:

> Trader-1:    just for my guide [Submitter-2] roughly
>              wher are we going to set 3m and 6m?

---

[3] Monday, March 17, 2008 was a quarterly IMM date, on which
trillions of dollars of swaps and futures contracts, in multiple
currencies, were settled worldwide for a three-month period.

```
Submitter-2:   3m0.92   6m 0.96

Trader-1:      can we go lower?

Submitter-2:   sure . . . dont think it will be that low
               though . . . but can do 090

               ****

Trader-1:      so can we set 6m at .94 too? . . .  6m is
               much more urgent . . . most urgent of the
               lot

               ****

Submitter-2:   i just put in 0.95 for 6mt

Trader-1:      ok . . . Thx
```

True to his/her agreement to accommodate Trader-1, Submittter-2
lowered UBS's 3-month Yen LIBOR submission from .92 to .90, and
lowered UBS's 6-month submission from .96 to .95.

26.  On some occasions, UBS Yen LIBOR submitters would also
amend, if possible, previously submitted Yen LIBOR contributions
to accommodate UBSSJ's trading positions.  For example, in an
April 4, 2008 electronic chat between Trader-1 and Submitter-2,
the following exchange occurred:

```
Trader-1:       have you put the libors in?

Submitter-2:    y[es] . . . any changes?

Trader-1:       oh was going to ask high 6m if not
                too late

Submitter-2:    i input 95 . . . which is on the
                lower side

Trader-1:       ok is it too late to change? . . .
                if not no drama
```

Submitter-2:        i try to change it now but cannot
                    gaurantee if it gets accepted
                    *****

Submitter-2:        just cahnged [sic] it to 0.98

The UBS 6-month Yen LIBOR submission that day was indeed .98, 3
basis points higher than Submitter-2's originally intended
submission.

27.    As another example, on June 29, 2009, Trader-1
contacted Submitter-2 by electronic chat, explaining that he had
huge positions that day and asking, "can we [submit] 6 m libor
high pls."   Submitter-2 stated that based on the information he
had, he would submit a 6-month Yen LIBOR of .7150.   Trader-1
responded by asking, "can we go 74 or 75 [meaning .74 or .75] .
. . we have [$2 million per basis point exposure] for the next
week."   Submitter-2 agreed to accommodate this request,
responding, "yes sure will.   I go with .75 for you[.]"   Thus,
the submitter agreed to move his/her 6-monthYen LIBOR submission
by 3.5 basis points that day to benefit the derivatives trader's
position.

 2) *Euroyen TIBOR*

28.    From in or around 2007 through 2009, on some
occasions, UBSSJ Yen derivatives traders also requested that the
TIBOR submitters contribute TIBOR submissions to benefit their
trading positions.   The TIBOR submitters' manager, Submitter-1,

routinely provided suggested TIBOR submissions based on the derivatives traders' positions, and the TIBOR submitters relied upon this input.

29.   For example, in a November 8, 2007 electronic chat, Submitter-1, who was also a UBS Yen derivatives trader, instructed the TIBOR submitter: "pls remind me tomorrow . . . we need to move the 1mos tibor up . . . maybe +2 tomorrow . . . then 1 bp on each for a few days . . . swap guys having some fixings." The TIBOR submitter responded "ok, noted".

30.   As another example, on July 23, 2009, Submitter-1 caused UBS's Euroyen TIBOR submissions to decrease for a different improper purpose.  On that day, Submitter-1 had the Euroyen TIBOR submitter drop UBS's 3-month TIBOR submission by 4 basis points simply to damage Trader-1's positions, and not because that is where he perceived Yen cash was trading.[4]   In an electronic chat with Trader-B at another Contributor Panel bank,[5] Trader-1 explained how he would rectify the situation by manipulating TIBOR settings higher the following week:

> [Submitter-1, who caused TIBOR to drop] hates me and is going to zurich . . . [his/her] last day is Friday . . . so [s/he] tried to screw my pos[ition] . . . next week we have control . . . so will try to get it

---

[4] During this period, Trader-1 and Submitter-1 were rivals at UBS and had feelings of animosity towards one another.

[5] Trader-1's dealings with Trader-B are discussed further below.

>            back up . . . or rather will do it . . . monday goes
>            back up

Later that same day, in a separate electronic chat with a cash
broker who handled transactions for Trader-1 ("Broker-A1"),[6]
Trader-1 described how he successfully reached out to the UBS
TIBOR submitters to raise UBS's 3-month submission back up:

>            Trader-1:  main thing is 3m tibor . . . i went to meet
>                       the guys who set it today
>            Broker-A1: you can asist there
>            Trader-1:  they just set where we ask
>            Broker-A1: ;-) perfect

### 3) *The Role of UBS and UBSSJ Managers*

   31.  Certain UBS and UBSSJ managers, and senior managers,
were aware of the internal manipulation of Yen LIBOR and Euroyen
TIBOR submissions by derivatives traders as described above.
For example, Trader-1's manager knew, at least as early as 2007,
that internal pressure was placed on UBS Yen LIBOR submitters,
and occasionally the Euroyen TIBOR submitters, to contribute
submissions to benefit the Yen trading book.  Further, certain
Zurich-based managers and more senior managers heading the
derivatives desks in all currencies were informed of the
pressure the Yen trading desk placed on the LIBOR submitters to
contribute Yen LIBOR to benefit the traders' positions.

---

[6] The role of cash brokers in the derivatives markets and money
markets, along with Trader-1's dealings with Broker-A1, are
discussed further below.

32.   Internal communications during 2007 and 2008 also reflect managers' continuing awareness of this conduct. Beginning in the summer of 2007, managers at UBS issued and implemented directions intended to ensure that its LIBOR submissions did not attract negative attention in the media. Under these directions, LIBOR submitters – including but not limited to Yen LIBOR submitters – were to "err on the low side" and, later, to formulate submissions that would be in the "middle of the pack" of the Contributor Panel banks.  These directions sometimes impeded the efforts to manipulate Yen LIBOR submissions to benefit derivatives traders' positions.  Managers were aware of this conflict.  For example:

a)   In December 2007, Trader-1 wished to have UBS Yen LIBOR submitters increase the bank's contribution to benefit his positions.  As a result, the manager of the Yen trading desk emailed London-based senior managers in the Investment Bank, and asked:

> How much pressure can we exert on [the Yen LIBOR submitter] to raise our 3[month] yen fixing over the next week? . . . Currently, we are in the bottom quartile [of the submitting banks], a move into the middle [where we can influence the resulting fix] is worth 500K. . . There is some reluctance on their part to move it higher as they are concerned about the reputational risks of putting in a high fix.

b)    The following year, in the fall of 2008, Trader-1 wished to have the UBS Yen LIBOR submitters manipulate Yen LIBOR contributions lower to benefit his derivatives trading positions.  As a result, on October 8, 2008, Trader-1's manager emailed the London-based senior manager heading derivatives trading globally, explaining the need to be accommodated:

> We have a large tibor/libor position which loses if
> libors move higher.  4[million dollars per basis
> point]. . . .Group treasury[7] has informed [LIBOR
> submitters] to put all fixings in the middle of the
> pack.  This has resulted in UBS personally contributing
> to a ½ bp higher fixing today.  Last year [in 2007]
> when we wanted Libors higher, we were told our fixing
> had to be low to show UBS's comparative strength.

The next day, Trader-1's manager again asked for relief from the "middle of the pack" directive by emailing a senior manager in London and stating:  "[W]e really need some co-operation on the yen libors from those who input.  The [UBS Yen LIBOR submitters] we are in contact with wont move them down as someone (think its [a Group Treasury senior manager in Stamford]) says we need to be in the middle of the pack."

---

[7] Group Treasury is the section of UBS AG's that monitors and oversees the financial resources of the entire bank, including the bank's liquidity and funding.

33.  The majority of UBS Yen LIBOR and Euroyen TIBOR
submitters, UBSSJ Yen derivatives traders, and their supervisors
— as well as the more senior managers at UBS and UBSSJ who were
aware of this conduct — knew that the manipulation of Yen LIBOR
and TIBOR submissions was inappropriate, yet continued to
encourage, allow, or participate in this conduct.  For example,
Trader-1's manager, a senior manager in the Investment Bank, the
primary Yen LIBOR and TIBOR submitters, and other derivatives
traders knew it is inappropriate, and contrary to the definition
of LIBOR or TIBOR, to consider derivative trading positions when
contributing LIBOR or TIBOR submissions.  Indeed, in an October
9, 2008 email, Submitter-1 complained to several other managers
that: "one of the things we signed up for when UBS agreed to
join the fixing panel was the condition that fixing
contributions shall be made regardless of trading positions."

34.  Because UBS's Yen LIBOR submitters, UBSSJ's
derivatives traders, and their managers knew this conduct was
improper, they tried to conceal the manipulation.  For example,
after an August 10, 2009 Trader-1 email request to lower 6-month
Yen LIBOR, a LIBOR submitter ("Submitter-4") complained to
Trader-1's manager that these requests should not be in writing.
Moreover, Trader-1 would sometimes request that LIBOR
submissions be moved in small increments over time to avoid
detection.

35.    Finally, and for the same reason, a UBS derivatives desk manager sought to obstruct the investigation into LIBOR manipulation.  In December 2010, Submitter-4, the UBS derivatives desk manager who had supervised Submitter-2 in 2009, instructed Submitter-2 to lie when interviewed by UBS attorneys during the investigation into LIBOR manipulation.  Among other things, the UBS manager instructed Submitter-2 to:

- falsely claim that the UBS Yen trading desks did not have any derivative positions with exposure to Yen LIBOR;
- avoid mentioning Trader-1;
- falsely indicate that the Yen LIBOR submission process did not take into account trading positions;
- falsely claim that they never moved the Yen LIBOR submissions to benefit the Yen trading desks;
- falsely claim that when contributing Yen LIBOR submissions, UBS tried to be "as close to the market as possible."

B.  *Use of Brokers to Manipulate Yen LIBOR*

36.    From at least 2007 through January 2010, two UBSSJ Yen derivatives traders also used cash brokers to manipulate Yen LIBOR submissions by enlisting these brokers to disseminate misinformation to other Contributor Panel banks regarding Yen LIBOR.

37.   Cash brokers track bids and offers of cash in the market and assist derivatives and money market traders in arranging transactions between financial institutions and other market participants.  As a result of their positions as intermediaries, some of these brokers developed relationships with traders and LIBOR submitters at various Contributor Panel banks and often possessed knowledge of interbank money market activity.   Accordingly, it is not unusual for LIBOR submitters to collect information from cash brokers regarding the availability and price of cash in the money markets and elsewhere.  This information can influence the LIBOR submissions of Contributor Panel banks.

   1) *Use of Brokers to Disseminate Misinformation*

38.   Certain UBSSJ Yen derivatives traders sought and received assistance from cash brokers by asking them to disseminate false market information to Yen LIBOR submitters at other Contributor Panel banks.  In this way, recipients of such misinformation could be influenced, often unwittingly, to contribute Yen LIBOR submissions that benefited UBSSJ Yen derivatives traders' positions.

39.   Trader-1 did a large volume of business in the Yen derivatives market, and he used brokers at several firms to help arrange his trades.  Trader-1 also used some of those brokers, in different ways, as part of his scheme to manipulate Yen

LIBOR.  Trader-1 engaged in this conduct beginning in 2007,
after discussing the strategy with his manager.

40.   Trader-1 carried out one significant part of this
scheme through his dealings with Brokerage-A.  Trader-1 used
Brokerage-A to broker derivative trades, and Broker-A1 serviced
Trader-1's account.  Another broker at that firm, Broker-A2,
distributed a daily email to the Contributor Panel banks, which
included "SUGGESTED LIBORS" purporting to represent where that
broker thought Yen LIBOR should be set that day based on his/her
market knowledge and experience.   Trader-1 used Broker-A1 to
pass along requests to Broker-A2 to adjust these suggested
LIBORs to benefit Trader-1's trading positions.   Broker-A2, at
least on some occasions, accommodated these requests.  Trader-
1's manager, who was well-aware of this manipulative tactic,
later estimated that during one six-month period in 2007, this
scheme was used on a daily basis and had a 50% to 60% success
rate.

41.   As an example, in a Wednesday, August 15, 2007
electronic chat, Trader-1 and Broker-A1 discuss Trader-1's
desire to raise the published 6-month Yen LIBOR fix:

> Trader-1:  need to keep 6m up till tues then let it
> collapse
>
> Broker-A1: doing a good job so far . . . as long as
> the liquidity remains poor we have a better
> chance of bullying the fix[.]

42.   The next day, Thursday, August 16, 2007,  Trader-1 reiterated his need for a high 6-month Yen LIBOR fix:

> Trader-1:  really really really need high 6m
> Broker-A1: yep think i realise  that
>              ****
> Broker-A1: yes mate, will make myself useful

That day, consistent with Trader-1's request, Broker-A2 again raised his/her suggested LIBOR, this time by an additional 6.5 basis points, where it remained for several days.

43.   Moreover, in a May 29, 2008 electronic chat, Trader-1 instructed Broker-A1 to "bring 3[-month LIBOR] down."  Broker-A1, acting as an intermediary for Broker A2, responded "[Broker-A2] had knocked 3m down small (already v low and says if it goes any further he will lose credibility)."

44.   Further, in a May 12, 2009 electronic chat, Broker-A1 notified Trader-1 that "[Broker-A2] has moved 6m libor up another 1/2bp and [unchanged] for 3m and 1m down small." Indeed, Broker-A2 modified his/her suggested LIBORs in precisely this fashion from the previous trading day.

45.   These suggested LIBORs distributed from Brokerage A were influential; indeed, Broker-A2's suggestions appear to have been wholly adopted by Yen LIBOR submitters at three other Contributor Panel banks during certain time periods.  For example, of the 523 total trading days between January 1, 2008

and December 31, 2009, there were 308 days in which suggested
Yen LIBOR in all 8 tenors listed in Broker-A2's email were
identical to those submitted by one Contributor Panel Bank
("Bank-E").  Further, there were many instances when Bank-E's
Yen LIBOR submissions for all 8 tenors changed identically each
day with the changes in Broker-A2'ssuggested LIBORs, often
matching the suggestions to 5 decimal points.

    46.  Trader-1 was aware that Broker-A2's suggested LIBORs,
when adjusted to benefit UBSSJ's derivatives desk's positions,
disseminated false information into the market.  The following
exchange occurred in an August 12, 2007 electronic chat between
Broker-A1 and Trader-1:

      Broker-A1:   like [Broker-A2] said to me last night, he
                    can try and tweak [Suggested LIBORs] by a
                    point or 2 when its flyiing [sic] but if he
                    marks too far from the truth the banks tend
                    to ignore him.
      Trader-1:    ok no probs . . . any help is better than
                    none!

    47.  Trader-1 also enlisted cash brokers to improperly
influence other Contributor Panel banks' Yen LIBOR submissions
through telephone conversations between brokers and Yen LIBOR
submitters at the other panel banks.  For example, in a February
9, 2009 electronic chat, Trader-1 asked Broker-C to cause a
colleague to suggest to other Contributor Panel banks to lower

their LIBOR submissions by stating that the broker's Yen
accounts "look[ed] a little softer."  While requesting that
Brokerage-C disseminate this misinformation, Trader-1 identified
at least two other brokerage houses that also assisted him in
manipulating Yen LIBOR, and indicated that he would reward
brokers for this type of assistance:

> Trader-1: do you know your cash desk? . . . ie the guy
> who covers yen on your cash desk
>
> Broker-C: yes mate i do
>
> Trader-1: right from now on i need you to ask him a
> favour on the fixes . . . i will make sure it
> comes back to you . . . i_alrteady do it with
> [Brokerage-A] . . . basically can you ask him
> to broke 3m cash ie libor lower for me today .
> . . i will look after you off the back of it.
> . . i do that for [Brokerage-B] too . . . so
> emphasise the importance to you . . . just
> suggest it looks a little softer to his
> accounts
>
> Broker C: ok mate i understand i will go and speak to him
>
> Trader-1: stuff like that . . . thanks mate . . . is very
> important to me today

After a five minute break, the two resumed their electronic
chat:

> Broker-C: just spoke to them and they are on the case
>
> Trader-1: ok mate much appreciated

48. As another example, in a February 25, 2009 electronic
chat, Trader-1 instructed Broker-B: "low 1m and 3m . . . we must
keep 3m down . . . try for low on all of em."  Broker-B
responded "ok ill do my best for those tday."   Trader-1 then
asked Broker-B to arrange for a "massive" trade and Broker-B
acknowledged that the trade would generate profits for him/her:

> Trader-1:  we can do 150 [billion] 2 yrs bro both sides
>             . . . ask [Trader-A2[8]] . . . will that help?
> Broker-B:  ok mate that will make us make budget for the
>             month so massive yes

Later that morning, Broker-B had a recorded telephone
conversation with the Yen LIBOR submitter at Bank-F ("Submitter-
F"), requesting that the submitter lower Bank-F's 3-month Yen
LIBOR submission, as follows:

> Broker-B       Could I ask you a small favor?
> Submitter-F:   Yeah.
> Broker-B:      Where are you going to set your Libor
>                threes today?
> Submitter-F:   Uh, same, .65.
> Broker-B:      Is there any way you might be able to
>                take it down [one basis point] cause
>                I'm getting a big trade out of it? . .
>                . I'm getting someone to do me a big
>                trade if they said I can help 'em sort
>                of get Libors down a little bit today.

---

[8] Trader-A2 was a Yen derivatives trader at Bank A.

Submitter-F had already entered the .65 3-month LIBOR submission on a form, which he had passed on to the Swiss Franc submitter sitting next to him.  However, Submitter-F can be heard on the recorded conversation requesting the submitter next to him to lower Submitter-F's 3-month Yen LIBOR submission from .65 to .64, pursuant to Broker-B's request: "Yeah, okay. Could you make the threes .64 []?"  Bank-F's 3-month LIBOR submission dropped from .65 to .64 that day, lowering the resulting LIBOR fix in favor of Trader-1's positions.

49.  As another example, in a March 31, 2009 electronic chat, Trader-1 asked Broker-C to  help influence 9 of the 16 Contributor Panel banks by convincing them to lower their LIBOR submissions from the previous day, thus lower the resulting 1-month and 3-month Yen LIBOR fix:

> Trader-1: mate we have to get 1m and 3m down . . . 1m
>           barely fell yesterday . . . real important
> Broker-C: yeah ok
> Trader-1: banks to have a go w in 1m are
> Trader-1: [Bank-F]
> Trader-1: [Bank-G]
> Trader-1: [Bank-H]
> Trader-1: [Bank-E]
> Trader-1: [Bank-I]
> Trader-1: [Bank-C]
> Trader-1: [Bank-A]
> Trader-1: [Bank-J]
> Trader-1: and [Bank-K]

```
              Trader-1: pls
              Broker-C: got it mate
```

That day, consistent with Trader-1's request, 6 of the 9
Contributor Panel banks listed above lowered their 1-month Yen
LIBOR submissions relative to the previous day, and the
resulting published 1-month Yen LIBOR fix dropped by a full
basis point from the day before.

    50.  As another example, in a March 19, 2009 electronic
chat, Broker-B confirmed that he accommodated Trader-1's request
to influence Yen LIBOR submitters at other Contributor Panel
banks:

```
              Trader-1: need low everything pls try really hard to
                        get [Bank-D] down
                        ****
              Broker-B: ok  will  try  mate
              Trader-1: ok try for [Bank-D] and the japanese and
                        [Bank-G] as priority . . . pls
              Broker-B: kkk
              Trader-1: thx . . . pls push really hard
```

48 minutes later, Broker-B resumed the chat, confirming that he
had spoken to the banks:

```
              Broker-B: yes already had a word with a couple of them
                        [Bank-D] and  [Bank-A] said they should be
                        lower . . . workin on [Bank-G] and [Bank-J]
```

51.   Trader-1 also used brokers to disseminate misinformation through a technique known as "spoof bids," whereby brokers, at Trader-1's request, would describe a potential opportunity to engage in certain money market transactions to Contributor Panel banks in an attempt to influence those banks' Yen LIBOR submissions.  In truth, there was no intention of going through with the purported money market transactions, and the fictional bids were designed solely to influence Yen LIBOR.  During a June 10, 2009 electronic chat, Trader-1 and Broker-B referred to this tactic when discussing efforts they would make that day to manipulate Yen LIBOR:

> Trader-1:   LOW 1m . . . LOW 3m . . . HIGH 6m . . . 6m is
>                     important today mate . . . pls spoof bids
> Broker-B:   rite ok mate ill make a special effort

Later in the same chat, Broker-B remarked to Trader-1:

> mate yur getting bloody good at this libor game . . . think
> of me when yur on yur yacht in monaco wont yu

*2) Use of Brokers as Conduits to Other Banks*

52.   On at least a few occasions, Trader-1 also used cash brokers as conduits to his counterpart traders at other Contributor Panel banks, enlisting the brokers to pass along Trader-1's requests to move Yen LIBOR submissions to benefit UBSSJ's trading book.  For example, in a May 21, 2009 electronic chat between Trader-1 and Broker-C, they stated:

30

```
Trader-1:    can you ask [Trader-A2] for a favour they
             moved 6m down 2bp yday . . . if they put it
             back up it would be great
Broker-C:    mate not sure if he does libors but i will
             investigate
Trader-1:    yeah i think he can ask a favour . . .  it
             would really help me out . . . ask for me
             . . . tell him its for [Trader-1]
```

### 3) *Compensation of Brokers*

53.   Trader-1 was considered the most successful Yen derivatives trader at UBSSJ,[9] and he compensated these brokers for their assistance in several ways: (1) by providing them with substantial amounts of business, thus generating fees or commissions; (2) by engaging in circular transactions (two equal and opposite transactions that canceled each other out) solely for the purpose of generating commissions for the brokers; and/or (3) by engineering a special compensation deal between UBSSJ and a brokerage house.

54.   For example, Broker-A2 was compensated for assisting Trader-1 in manipulating Yen LIBOR by a special bonus, and other perks, as evidenced in an August 22, 2008 electronic chat:

```
Broker-A1:    think [Broker-A2] is your best broker in
              terms of value added :-)
Trader-1:     yeah . . . i reckon i owe him a lot more
```

---

[9] Trader-1 generated approximately $40 million in profits for UBS in 2007, $80 million in 2008, and $116 million during the first 9 months of 2009 until he left UBS in September, 2009.

Broker-A1:     he's ok with an annual champagne shipment,
               a few [drinking sessions] with [his
               supervisor] and a small bonus every now and
               then.

4) *Knowledge of Yen LIBOR Manipulation Through Cash Brokers*

55.  Trader-1's use of brokers to manipulate Yen LIBOR was
widely known among the traders on the UBSSJ Yen trading desk
from 2007 through 2009.  In fact, the desk held daily morning
meetings before LIBOR was set, in which Trader-1 commonly
announced the direction in which he intended to manipulate Yen
LIBOR that day.

56.  After Trader-1 left UBSSJ in September 2009, the more
junior trader who replaced him had discussions with the manager
of the Yen trading desk.  Based on those discussions, the junior
trader felt pressured to continue using brokers to manipulate
Yen LIBOR through January 2010.

57.  The LIBOR submitters, derivatives traders, and their
managers knew this conduct was wrong and therefore attempted to
avoid creating evidence of the manipulation.  For example, after
media reports regarding banks' suspected manipulation of LIBOR,
the manager of the Yen derivatives desk cautioned that they
should avoid creating written records and should instead use
cell phones when contacting brokers.  Moreover, to avoid
detection of their manipulation, UBSSJ derivatives traders and

brokers used coded language in communications to discuss the
dissemination of misinformation to other Contributor Panel banks
to influence the ultimate Yen LIBOR fix.

C.   *Efforts to Collude with Other Banks to Manipulate Yen LIBOR*

58.   From at least as early as January 2007 and at various
times until at least approximately September 2009, Trader-1
communicated with derivatives traders at other Yen LIBOR
Contributor Panel banks in an effort to manipulate Yen LIBOR to
benefit his trading positions.   Trader-1 requested that his
counterpart traders at other Contributor Panel banks make
requests to their respective Yen LIBOR submitters to contribute
a particular LIBOR submission, or to move their submission in a
particular direction (i.e., up or down).   Trader-1 made these
requests to his counterpart traders at other Contributor Panel
banks on many occasions.

59.   On February 2, 2007, Trader-1 described this method of
manipulating LIBOR in an electronic chat with his counterpart
Yen derivatives trader ("Trader-A1") at another Contributor
Panel bank ("Bank-A"):

> Trader-1:   3[month] libor is too high cause I have kept
>             it artificially high
>
> Trader-A1:  how[?]
>
> Trader-1:   being mates with the cash desks, [another
>             Contributor Panel bank, ("Bank-C")] and I
>             always help each other out too.

Trader-A1:   that's useful to know.

60.     By April 2007, Trader-1 had requested Trader-A1 to solicit Bank-A LIBOR submitters to contribute submissions which benefited UBSSJ's Yen trading positions.  For example, in an April 20, 2007 electronic chat, Trader-1 stated to Trader-A1:

> I know I only talk to you when I need something but if you could ask your guys to keep 3m low wd be massive help as long as it doesn't interfere with your stuff . . . tx in advance.

Approximately 30 minutes later Trader-1 and Trader-A1 had the following chat:

> Trader-1:   mate did you manage to spk to your cash boys?
>
> Trader-A1:  yes u owe me they are going 65 and 71
>
> Trader-1:   thx mate yes I do . . . in fact I owe you big time

Approximately 45 minutes later, after checking to see if Bank-A lowered its 3-month Yen LIBOR submission to 65, Trader-1 sent the following message to Trader-A1:

> Mate[y] they set 64! . . . that's beyond the call of duty!

61.     Trader-1 also occasionally requested his counterpart derivatives trader ("Trader-B") at another Contributor Panel bank ("Bank-B") to have Bank-B contribute Yen LIBOR submissions to benefit UBSSJ's Yen trading positions.  For example, on May 21, 2009 Trader-1 asked Trader-B: "cld you do me a favour would

you mind moving you 6m libor up a bit today, I have a gigantic fix." Trader-B — who also sometimes acted as the Yen LIBOR submitter for Bank-B — responded "I can do that." As promised, Trader-B raised Bank-B's 6-month Yen LIBOR submission by 6 basis points that day.

62.   Trader-1 also asked his counterpart derivatives trader ("Trader-C") at a third Contributor Panel bank ("Bank-C") to have Bank-C contribute Yen LIBOR submissions to benefit UBSSJ's Yen derivatives trading positions.  For example, in a January 29, 2007 electronic chat with Trader-1, Trader-C asked: "[A]nything you need on libors today? High 6m would help me." Trader-1 responded, "high 3m I'll sort our 6m rate for you thanks."  As promised, Trader-1 made a request to the UBS Yen LIBOR submitter for a high 6-month contribution.

63.  As a final example, Trader-1 also contacted his counterpart derivatives trader ("Trader-D") at a fourth Contributor Panel bank, ("Bank-D"), in an effort to influence Bank-D's Yen LIBOR submissions in order to benefit UBSSJ's trading positions.  For example, in a June 28, 2007 electronic chat with Trader-D, Trader-1 asked:  "pls ask ur mate for high 6m mate . . . wd be really really grateful."  Trader-D responded:  "will do, for the record he's def not my 'mate'!  . . . but I'll [send him an electronic chat]."  As requested, approximately 15 minutes later, Trader-D sent an electronic chat

to the Bank-D Yen LIBOR submitter stating, "high 6m yen libor would be gd according to my brother!"  The Yen LIBOR submitter responded, "WILL DO MY BEST."

64.   Trader-1 knew that coordinating with other Contributor Panel banks to manipulate Yen LIBOR was wrong.  In a July 22, 2009 electronic chat with Broker-A1, Trader-1 described his plan to coordinate Yen LIBOR submissions with other Contributor Panel banks over the next few weeks while staggering drops in submissions so as to avoid detection:

> Trader-1:     11th aug is the big date . . .  i still have
>                      lots of 6m fixings till the 10th
>                      ****
> Broker-A1:  if you drop your 6m dramatically on the 11th
>                      mate, it will look v fishy, especially if
>                      [Bank D] and [Bank B] go with you. I'd be v
>                      careful how you play it, there might be
>                      cause for a drop as you cross into a new
>                      month but a couple of weeks in might get
>                      people questioning you.
> Trader-1:     don't worry will stagger the drops . . . ie
>                      5bp then 5bp
> Broker-A1:  ok mate, don't want you getting into sh it
> Trader-1:     us then [Bank B] then [Bank D] then us then
>                      [Bank B] then [Bank D]
> Broker-A1:   great the plan is hatched and sounds
>                      sensible

65.   As early as February 2007, certain other UBSSJ derivatives traders and UBS submitters were aware of Trader-1's

use of other Contributor Panel banks to manipulate the resulting
published Yen LIBOR fix.  For example, in a February 15, 2007
electronic chat between Trader-1 and Submitter-1, the following
exchange occurred:

> Trader-1:    can we keep the fix down and let it jump
>              tomorrow?
>
> Submitter-1: i've asked [submitter who is filling in] to
>              keep it low today . . . tomorrow u tell me
>              what u prefer
>
> Trader-1:    ok if we can try to keep our move really
>              really low wd be big help
>
> Submitter-1: we do our very best ... but will probably
>              fall out [of the middle-two quartiles of
>              submissions averaged to determine the LIBOR
>              fix] anyway
>
> Trader-1:    ok you don't have anyone you know anywhere
>              else you can have a word with? as a favour?
>
> Submitter-1: got to pass i'm afraid...never having
>              worked in london doesnt' give me that edge;
>              if i was [in the] same poz i'd ask you to
>              have a word with [Bank-C] ;-)
>
> Trader-1:    already done that . . . and [Bank-A]
> Submitter-1: good man

66.  The following week, in a February 22, 2007 electronic
chat, Trader-1 attempted to enlist Submitter-3 to contact other
Contributor Panel banks to manipulate Yen LIBOR submissions to
benefit UBSSJ's Yen derivatives book:

> Trader-1:    ok hopefully we'll get the fixings down

Submitter-3:   I try

Trader-1:      thanks do you have any contacts in ldn you
               can ask also? ie other cash traders?

Submitter-3:   other forward traders yes

Trader-1:      thx [Submitter-3] any help appreciated . .
               . if they set libors!

67.   Certain UBS and UBSSJ managers were also on notice of
Trader-1's communications with his counterpart traders and Yen
LIBOR submitters at other Contributor Panel banks about
obtaining favorable Yen LIBOR submissions.  In a July 3, 2009
email, Trader-1's manager, in an attempt to keep Trader-1 from
leaving for another bank, lobbied other UBSSJ managers to award
a sizable bonus to Trader-1.  In the email, Trader-1's manager
listed some of his attributes, such as "strong connections with
Libor setters in London.  This information is invaluable for the
derivatives books."  This email was sent to a senior manager of
the Investment Bank in Zurich, who forwarded it to derivatives
desk managers, asking for their input.  One manager replied:

        [Trader-1] does also know some of the traders at other
        banks (from his London days) but personally I find it
        embarrassing when he calls up his mates to ask for
        favours on high/low fixings . . . it makes UBS appear
        to manipulate others to suit our position; what's the
        legal risk of UBS asking others to move their fixing?

68.   Despite these communications to UBS and UBSSJ managers
and senior managers, no one at UBSSJ disciplined or even

reprimanded Trader-1, and no one referred this matter to
Compliance.  Trader-1 continued working as a derivatives trader
at UBSSJ until he left on his own accord in September 2009.

III.

IMPLICATIONS OF THE DERIVATIVES TRADERS' REQUESTS

69.   When UBSSJ derivatives traders made requests of UBS
rate submitters in order to influence UBS's benchmark interest
rate submissions, and when the submitters accommodated those
requests, the manipulation of the submissions affected the fixed
rates on various occasions.

70.   Likewise, when UBSSJ derivatives traders influenced
the submissions of other Contributor Panel banks – either by (1)
seeking and receiving accommodations from their counterparts at
such banks, or (2) influencing the submissions from other banks
with assistance from cash brokers who disseminated
misinformation in the marketplace – the manipulation of those
submissions affected the fixed benchmark rates on various
occasions.

71.   Indeed, the purpose of this activity was to manipulate
benchmark submissions from UBS and other banks to influence the
resulting fixes and thus to have a favorable effect on the
derivatives traders' trading positions.  Because traders'
compensation was based in part on the profit and loss

39

calculation of the trading books, derivatives traders' requests were intended to benefit their compensation as well.

72.  Because of the high value of the notional amounts underlying derivative transactions tied to LIBOR and Euroyen TIBOR, even very small movements in those rates could have had a significant positive impact on the profitability of a trader's trading portfolio, and a correspondingly negative impact on their counterparties' trading positions.

73.  UBSSJ entered into interest rate derivatives transactions tied to LIBOR and Euroyen TIBOR – such as derivatives, forward rate agreements, and futures – with counterparties to those transactions.  Many of those counterparties were located in the United States.  Those United States counterparties included, among others, asset management corporations, mortgage and loan corporations, and insurance companies.  Those counterparties also included banks and other financial institutions in the United States or located abroad with branches in the United States.

74.  In the instances when the published benchmark interest rates were manipulated in UBSSJ's favor due to UBSSJ's manipulation of UBS's or any other Contributor Panel bank's submissions, that manipulation benefitted UBSSJ derivatives traders, or minimized their losses, to the detriment of counterparties, at least with respect to the particular

transactions comprising the trading positions that the traders took into account in making their requests to the rate submitters.  Certain UBSSJ derivatives traders and UBS rate submitters who tried to manipulate LIBOR and Euroyen TIBOR submissions understood the features of the derivatives products tied to these benchmark interest rates; accordingly, they understood that to the extent they increased their profits or decreased their losses in certain transactions from their efforts to manipulate rates, their counterparties would suffer corresponding adverse financial consequences with respect to those particular transactions.

75.  When the requests of derivatives traders for favorable LIBOR and Euroyen TIBOR submissions were taken into account by the UBS rate submitters, UBS's rate submissions were false and misleading.  Those false and misleading LIBOR and Euroyen TIBOR contributions affected or tended to affect the price of commodities, including futures contracts.  Moreover, in making and in accommodating these requests, the derivatives traders and submitters were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties.  As part of that effort: (1) derivatives traders and submitters submitted and caused the submission of materially false and misleading LIBOR and Euroyen TIBOR contributions; and (2) derivatives traders, after initiating and continuing their effort to

manipulate LIBOR and Euroyen TIBOR contributions, negotiated and entered into derivative transactions with counterparties that did not know that UBSSJ employees were often attempting to manipulate the relevant rate.